J-S19001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| B.L. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| L.S. | : | |
| | : | |
| Appellant | : | No. 273 MDA 2023 |

Appeal from the Order Entered February 7, 2023
In the Court of Common Pleas of York County Civil Division at No(s):
2021-FC-001377-03

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:      **FILED: AUGUST 15, 2023**

Appellant, L.S. ("Mother"), appeals from the trial court's February 7, 2023 order entered following a three-day custody trial, wherein the trial court, *inter alia*, affirmed its determination that B.L. ("Father") have sole legal custody and primary physical custody of H.L. and L.L. ("Children").[1] After careful review, we affirm.

The trial court provided the following background on this matter:

The parties were previously married and subsequently divorced while living in South Carolina. The parties have two young children. After the divorce, Mother relocated from South Carolina to Pennsylvania with … [C]hildren. Father is in the Marine Corps and was subsequently stationed in Mississippi. Father filed a complaint for custody, seeking expanded rights of physical

---

[1] H.L. was born in 2015, and L.L. was born in 2016.

custody.[2]    Mother opposed.[3]    The [c]ourt filed temporary custody orders after the first two days of the custody trial on March 8, 2022[,] and on August 11, 2022.  In the order following the second day of trial, August 11, 2022, the [c]ourt temporarily gave [F]ather sole legal custody and primary physical custody of [C]hildren.  On December 28, 2022, the third and final day of trial, the [c]ourt entered an order, which was filed on January 3, 2023, affirming sole legal custody and primary physical custody with Father.[4, 5]  On January 27, 2023, Mother filed a notice of appeal and a concise statement of errors [complained of on appeal] in relation to the order filed on January 3, 2023.[6]  On January 13, 2023, [Father] petitioned for reconsideration.[7]   A hearing on reconsideration was held on January 31, 2023.  The petition for reconsideration was really a petition for clarification.  The order of

_____

[2] Prior to Father's complaint, Mother had primary physical custody of Children. Mother and Father shared legal custody, except that Mother had ultimate decision-making authority if they disagreed.

[3] In addition, W.L. and N.L. ("Paternal Grandparents"), who live about twenty minutes away from Mother in Maryland, subsequently filed a petition to intervene, which the trial court granted.  *See* N.T., 3/4/22, at 196 (Mother's stating that Paternal Grandparents live about twenty minutes away from her). Paternal Grandparents claimed that Mother was not allowing them to see Children.  They requested, among other things, physical custody of Children when Father is unable to exercise his physical custody periods.

[4] The January 3, 2023 final custody order, *inter alia*, gave Mother partial physical custody of Children on two weekends per month, and for two, two-week periods (for a total of four weeks) during the summer.

[5] Paternal Grandparents indicated at trial that "they do not need time in addition to Father's primary physical custody[,]" and therefore, the trial court awarded them no time.  N.T., 12/28/22, at 119.

[6] This appeal was docketed at 160 MDA 2023.

[7] Father sought reconsideration and clarification on whether Mother may exercise her weekend custody of Children in Mississippi or Pennsylvania, as well as how the parties should split travel expenses and share custody of Children on holidays.  On January 19, 2023, the trial court entered an order expressly granting reconsideration and scheduling a hearing on the petition for reconsideration.

clarification was entered on January 31, 2023[,] and filed on February 7, 2023. [Therein , among other things, the trial court reaffirmed that Father have sole legal custody and primary physical custody of Children. Mother then filed another, timely notice of appeal and a concise statement.[8, 9] The trial court thereafter issued a Pa.R.A.P. 1925(a) opinion.]

Trial Court Opinion ("TCO"), 2/27/23, at 1-2.

On appeal, Mother raises four issues for our review:

[1]. The [t]rial [c]ourt abused its discretion and committed an error of law by excluding testimony and documentary evidence intended to impeach and to rebut testimony from both Father and the Guardian *Ad Litem* [("GAL")] regarding the military investigation of Father and past abuse of [H.L].

[2]. The [t]rial [c]ourt abused its discretion and committed an error of law by finding Mother has committed Parental Alienation Syndrome without expert testimony and evidence to support such a conclusion[,] and then using this finding to support [its] conclusion on a majority of the factors set forth in 23 Pa.C.S. § 5328(a).

[3]. The [t]rial [c]ourt abused its discretion and committed an error of law by failing to consider and to analyze the factors set forth in 23 Pa.C.S. § 5337(h).

[4.] The [t]rial [c]ourt abused its discretion and committed an error of law by transferring primary physical custody of [C]hildren to [Father] before all testimony and evidence was presented and prior to the conclusion of trial.

---

[8] This is the appeal presently before us, docketed at 273 MDA 2023.

[9] This Court subsequently quashed Mother's appeal at 160 MDA 2023. **See** Pa.R.A.P. 1703(b)(3)(ii) ("After an appeal is taken…, the trial court … may … [g]rant reconsideration of the order which is the subject of the appeal … if an order expressly granting reconsideration of such prior order is filed in the trial court … within the time prescribed by these rules for the filing of a notice of appeal … with respect to such order, or within any shorter time provided or prescribed by law for the granting of reconsideration. A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal … theretofore or thereafter filed or docketed with respect to the prior order.").

Mother's Brief at 6.[10, 11]

In addressing Mother's issues, we remain cognizant of the following:

The appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

Moreover,

[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

The test is whether the evidence of record supports the trial court's conclusions.

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014) (cleaned up).

**I.**

_____

[10] We have re-ordered Mother's issues for ease of disposition.

[11] Father has filed an appellee's brief, which Paternal Grandparents have joined.

In Mother's first issue, she contends that the trial court "abused its discretion and committed an error of law by excluding testimony and documentary evidence intended to impeach and to rebut testimony from both Father and the [GAL] regarding the military investigation of Father and past abuse of [H.L.]." Mother's Brief at 36 (emphasis omitted).[12] Mother's argument on this issue is not the model of clarity. First, with respect to the military investigation of Father, Mother does not clearly explain what evidence from the military investigation the trial court purportedly excluded and why the trial court abused its discretion in allegedly excluding it.[13] Instead of discussing the exclusion of such evidence, she seems to challenge the **weight**

_____

[12] In reviewing this issue, we are mindful that "[t]he decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." **Egelkamp v. Egelkamp**, 524 A.2d 501, 504 (Pa. Super. 1987) (citation omitted).

[13] Mother provides no background on the military investigation in her brief, in contravention of Rule of Appellate Procedure 2117. **See** Pa.R.A.P. 2117(a)(4) (providing that the statement of the case shall contain "[a] closely condensed chronological statement, in narrative form, of all the facts which are necessary to be known in order to determine the points in controversy, with an appropriate reference in each instance to the place in the record where the evidence substantiating the fact relied on may be found"). However, after reading the transcripts from the custody trial, we note that the military investigated Father shortly after the parties separated, in early 2019, for allegedly abusing Mother. **See** N.T., 3/4/22, at 24-25, 69-72; N.T., 8/11/22, at 106-08. There were conflicting accounts at trial about the results of the military investigation. Mother testified that "the basis for conduct unbecoming of an officer and a gentleman due to [Father's] abusing [her] was met," but claimed that she was restrained at a pre-trial conference from reaching out to the military to obtain supporting evidence. N.T., 8/11/22, at 107. Father, on the other hand, represented that the abuse allegations made to the military were false and that he was vindicated of any wrongdoing. N.T., 3/4/22, at 69-72.

the trial court placed on it. To illustrate, she complains that "[t]he abuse of Mother by Father as reported to the military by a third party, while admitted into evidence to some extent, was given no consideration by the [t]rial [c]ourt." *Id.* at 38 (citation omitted); *see also id.* at 36 ("Father's abusive conduct toward Mother was also set forth in her testimony. However, the weight given to that testimony, Mother acknowledges, is in the discretion of the [t]rial [c]ourt."). Thus, because the crux of Mother's argument pertaining to the military investigation involves the *weight* the trial court placed on such evidence, we deem her claim that the trial court wrongly *excluded* such evidence from trial to be waived. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. … The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. … [W]hen defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.") (citations omitted).[14]

Second, with respect to Father's purported past abuse of H.L., Mother claims that the trial court "summarily dismissed and excluded" evidence of

---

[14] Moreover, to the extent Mother challenges the weight the trial court placed on the evidence of the military investigation, we deem that claim waived due to Mother's failure to raise it in her statement of questions involved. *See* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

Father's abuse of H.L. Mother's Brief at 36.[15] Specifically, she cites to the

following portion of the transcript where the trial court excluded a report of a

forensic interview taken of H.L. in South Carolina years prior:

> [Mother's counsel:] You said what H.L.'s been through previously, and one of the factors the [c]ourt has to consider is abuse. Has [Father] physically abused H.L. in the past?
>
> [Mother]: Yes.
>
> [Mother's counsel:] What did he do? What did [Father] do?
>
> [Mother]: He threw H.L. across the room. H.L. landed on his neck. And then [Father] proceeded to tear H.L.'s bunk bed into shreds in front of him, beat it to pieces, and then made H.L. sleep on the floor because H.L. was supposed to be sleeping but he made a mess in the bathroom. He's also spanked H.L. so hard [that] he got blisters on his rear end.
>
> [Mother's counsel:] When were these events?
>
> [Mother]: Prior to leaving my marriage.
>
> THE COURT: Can you give me some year?
>
> [Mother:] So H.L. was three, so he's seven, four or five years ago.
>
> [Mother's counsel:] Did you witness this?
>
> [Mother]: I did.
>
> [Mother's counsel:] Was H.L. interviewed?
>
> [Mother:] H.L. was forensically interviewed.
>
> [Mother's counsel:] If you turn to D-13, is this a report of H.L.'s forensic interview in South Carolina?
>
> [Paternal Grandparents' counsel:] I'm going to object because it can't be authenticated and it was litigated previously, and I believe Your Honor had already requested that we limit the scope

---

[15] Again, Mother provides no factual background in her brief on this alleged abuse. *See* Pa.R.A.P. 2117(a)(4), **supra**.

of the testimony to the events that occurred from the last order moving forward.

[Mother's counsel:] Your Honor, that is what you ordered in December. However, I'm sure the [c]ourt recalls[,] in March[,] there was significant testimony regarding events prior to January of 2021.

THE COURT: Well--

[Mother's counsel:] I'm also offering … this under Rule of Evidence 607[,] where the credibility of any witness or any party can be attacked or challenged by any evidence that's relevant to the issue. And abuse is a factor the [c]ourt has to consider.

THE COURT: I get all that, but without an expert telling me that a four-year-old is old enough to be competent, he was four when this interview took place, that's not competent testimony. It's excluded.

N.T., 8/11/22, at 58-60 (original brackets omitted).

Mother does not proffer a legal argument or explanation as to why the trial court abused its discretion in excluding this evidence.[16] Instead, she argues that, if this evidence had been admitted, it would have offered an explanation, aside from Mother's behavior, for why H.L. has anxiety. Thus, because Mother does not set forth a legal analysis pertaining to why the trial court abused its discretion in excluding the forensic report, we also conclude this claim is waived. **See Hardy**, **supra**. Thus, no relief is due on Mother's first issue.

**II.**

_____

[16] We also note that Mother admitted at trial that every single report, made to the South Carolina authorities implicating Father in some kind of physical or sexual abuse of Children, was investigated by the South Carolina authorities and determined to be unfounded. N.T., 8/11/22, at 106.

In Mother's second issue, she avers that the trial court "abused its discretion and committed an error of law by finding Mother has committed Parental Alienation Syndrome without expert testimony and evidence to support such a conclusion[,] and then using this finding to support [t]he [c]ourt's conclusions on a majority of the factors set forth in 23 Pa.C.S. § 5328(a)." Mother's Brief at 39 (emphasis omitted).[17] We disagree.

Section 5328(a) provides:

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

_____

[17] Mother does not provide a definition for Parental Alienation Syndrome in her brief. However, our research shows that Parental Alienation Syndrome refers to "a child's unwarranted rejection of one parent in response to the attitudes and actions of the other parent." Amy J.L. Baker, *Parental Alienation Syndrome–The Parent/Child Disconnect*, SOCIAL WORK TODAY Vol. 8. No. 6 (Nov/Dec 2008), *available at* https://www.socialworktoday.com/archive/102708p26.shtml.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

Here, the trial court set forth the following reasons for why, pursuant to

the Section 5328(a) factors, it awarded Father primary physical custody and

sole legal custody of Children:

> Going through the factors now, the first factor is which party is
> more likely to encourage and permit frequent and continuing
> contact between the child and the other party. This factor is a
> great place for the [c]ourt to put on the record that the [c]ourt
> has concluded that [M]other has engaged in Parental Alienation
> Syndrome and has done so consistently and to a point where it
> has adversely affected [C]hildren. As a result of that, [M]other
> has discouraged [C]hildren from having [a normal] relationship
> with their [F]ather. While the [c]ourt observed testimony and
> evidence of [M]other's Parent[al] Alienation Syndrome during the
> various hearings, the [c]ourt cannot help b[ut] also point out that
> the [GAL] indicated the same, and, in fact, recommended that
> [C]hildren go to [F]ather because of [M]other's false allegations
> and her trying to literally steer … [C]hildren [a]way from a normal
> relationship with [F]ather and [F]ather's parents.[18] So this factor
> is a very high factor in favor of [F]ather.
>
> Factor two, present or past abuse committed by a party, and
> whether there is a continued risk of harm to the child. The [c]ourt
> has concluded that [M]other's Parent[al] Alienation Syndrome is
> emotional abuse to [C]hildren. The [Parental G]randparents
> requested [M]other's periods be supervised because of that. The
> [c]ourt is not taking that drastic action. But if [M]other does not
> change her ways, at some future hearing, because a modification
> has been requested or whatever, the [c]ourt might do that,
> because the [c]ourt is concerned about a risk of harm to these
> [C]hildren by [M]other's emotional abuse. In any event, coupled
> with factor number one, it is a factor high in favor of [F]ather.
>
> Factor 2.1, is involvement by protective services, and is not a
> factor.

---

[18] At trial, the GAL testified that she recommends that Father be the primary custodian of Children because "[M]other is alienating [C]hildren from [F]ather. And my concern is primarily over the older child, H.L. I believe that not only is there alienation, but there is also significant loyalty issues that H.L. has with [M]other." N.T., 3/4/22, at 157 (original brackets omitted).

Factor three, the parental duties performed by each party on behalf of the children. Both parents have performed those parental duties at various time to various degrees. Therefore, it's a neutral factor.

Factor number four, the need for stability and continuity in the children's education, family life, and community life. Unfortunately, [M]other's false allegations and other actions [have] led this [c]ourt to conclude that she's engaged in Parent[al] Alienation Syndrome which has resulted in instability with [C]hildren. The [GAL] made a good bit in her report about [H.L.'s] anxiety, and there seems to be a link between [H.L.'s] anxiety and [M]other['s] calling the State Police to come get the iPad, so this is a factor also in favor of [F]ather.[19]

Factor number five, the ability [*sic*] of extended family. Both parties have extended family, so that is a neutral factor.

Factor six, the children's sibling relationships[,] is not a factor.

Factor seven, the well-reasoned preference of the child. The [c]ourt did not interview [L.L]. The [c]ourt did interview [H.L]. [H.L.] did express at the time that he wanted to stay with [M]other. However, just as the [GAL] concluded in her report, this [c]ourt concluded that that was coached and was not a well-reasoned preference, so that preference has been ignored by the [c]ourt.[20]

_____

[19] For context, in January of 2022, Father bought an iPad for Children so that he could more easily contact them when they are with Mother. N.T., 3/4/22, at 25, 61-62. Mother did not want the iPad in her house because she believed it was "being used in an attempt to get her information." **Id.** at 23-24; **see also id.** at 28, 30. She therefore contacted the Pennsylvania State Police. **Id.** at 23-24. The police seized the iPad and were investigating it at the time of trial. **Id.** at 25-26, 28.

In the GAL's report, the GAL noted that — when interviewing H.L. — he discussed having "worry attacks" and "mentioned that the 'cops came and took his Father's iPad' from his Mother's house and now he worries they will come and arrest his Mother." Report of GAL, 2/11/22, at 9.

[20] With respect to H.L.'s being coached, the GAL testified:

*(Footnote Continued Next Page)*

Factor eight, the attempts of a parent to turn a child against the other parent. This is exactly what Parent[al] Alienation Syndrome is, so this factor is subsumed in factors one and two.

Factor nine, which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the children adequate for their emotional needs. Again, [M]other has had a lot of drama in … [C]hildren's lives as part of her campaign to drive them away from [F]ather. Therefore, just like factor number four, this is a factor in favor of [F]ather.

Factor number ten, which party is more likely to attend to the daily, physical, emotional, developmental, educational, and special needs of the children. Coupled with [M]other's Parent[al] Alienation Syndrome, the [c]ourt finds that [M]other tends to be what the [c]ourt will refer to in the vernacular as a helicopter mom. The [c]ourt was puzzled why [M]other feels it necessary to help a six-year-old and a seven, almost eight-year-old child have showers.[21] This [j]udge took showers by himself when he was

_____

In interviewing H.L., it was obvious to me that he was being coached by [M]other as to what to say. Again, the level of coaching and alienation in this case is more than I had ever seen before.

[H.L.] said, I can't remember what I'm supposed to tell you. And also[,] H.L. would tell me stories about activities that he would do with his [F]ather or grandparents[,] and then it became obvious that something clicked that he should not be enjoying those experiences. And then he would say, however, I don't want to see my [F]ather or I don't want to see my grandparents.

N.T., 3/4/22, at 159 (original brackets omitted). *See also* Report of GAL at 9-10 ("[H.L. said multiple times during the interview, 'I have something to tell you[,]' but then said 'I forget' when I asked him what it was. I have observed similar behaviors from children, especially young ones when they are being coached on what to say or discuss.").

[21] To elaborate, Mother testified that, when in Father's care,

[H.L.] gets himself in the shower by himself. He does not use soap, because he said he's afraid it's going to burn his eyes and burn his skin. I did send them hypoallergenic[,] tear-free[,] sting-

*(Footnote Continued Next Page)*

five. That … was only one of many times where [M]other seemed to be over involved with [C]hildren. Therefore, even factor number ten is in favor of [F]ather.

Factor 11, the proximity of the residences of the parties. Obviously[,] … [M]other [lives] in Pennsylvania[,] and [F]ather in Mississippi. I'm not sure if the [c]ourt heard testimony, but the [c]ourt knows that that is at least a thousand miles, probably more, and typically is going to have to … have [C]hildren go back and forth by airfare. This [c]ourt has not gone through the relocation factors, because the [c]ourt did not think it necessary; but the [c]ourt has very much taken into account the fact that the parties are so far apart. The [c]ourt has tried to craft an order providing [M]other with as much time with … [C]hildren as the [c]ourt believes is in [C]hildren's best interest.

Factor 12, each party's availability to care for the children or make appropriate child care arrangements. That is not a factor.

Factor 13, the level of conflict between the parties and the willingness and ability of the parties to cooperate with each other. Unfortunately, this is tied in with factor one and factor eight in that there is a lot of conflict. Mother continually accuses [F]ather of things he hasn't done. Even today[, M]other accused [F]ather of not telling her who [H.L.'s] counselor was, but the [c]ourt saw in … OurFamilyWizard[22] where [F]ather did specifically tell

---

free soap. He said he's still afraid to use the soap, because he doesn't have any help; and if it gets in his eyes, it's going to burn.

The same thing with [L.L.]. After [H.L.] is done, [L.L.] gets herself in the shower by herself. She says she has a hard time adjusting the temperature. I know this because when they are with me, I help them shower. I help them adjust the temperature, help them get the soap out of their eyes when they are saying, "Mommy, daddy doesn't do this with us. We have to do all of this by ourselves. He doesn't help us with anything." So those are some of the difficulties.

N.T., 12/28/22, at 31-32.

[22] OurFamilyWizard is a custody and co-parenting website and app. **See B.G. v. S.G.**, 2021 WL 1402261, at *4 n.8 (Pa. Super. filed Apr. 14, 2021); **see**
*(Footnote Continued Next Page)*

[M]other who [H.L.'s] therapist was and [the] name of the practice and everything, so this is all tied in with [M]other's Parent[al] Alienation Syndrome. Factor 13 is in favor of [F]ather.

Factor 14, history of drug and alcohol abuse. The [c]ourt heard some testimony about [M]other's alleged alcohol abuse. That may be part of the reason why [M]other engages in Parent[al] Alienation Syndrome, but [M]other's motivations for that are not something that this [c]ourt can speculate on, and, therefore, this is not a factor.

Factor 15, mental and physical condition of a party or a member of a party's household. Just like in [factor] 14, [M]other maybe could be helped by some therapy, either parenting or individual therapy, but the [c]ourt is not going to speculate on that. Therefore, factor 15 is not a factor.

Factor 16, any other relevant factor. This [c]ourt has already talked about a rather strong recommendation by the [GAL] for [F]ather to have majority custody. This [c]ourt has taken a good bit of credence in th[e GAL's] report, particularly since the [c]ourt is aware that that [GAL] has a great deal of family law experience as well as experience as a hearing officer. In addition, the [c]ourt's hearing the evidence and seeing the exhibits have caused the [c]ourt to conclude exactly what the [GAL] put in her report, and, therefore, that is another factor in favor of [F]ather.

N.T., 12/28/22, at 124-29.

Mother attacks the trial court's Section 5328(a) analysis on appeal, complaining that the trial court "could have and should have appointed an expert to conduct an evaluation and offer an opinion to the [c]ourt as to whether or not Parental Alienation Syndrome was present in the case." Mother's Brief at 39. She says that "the behaviors leading to and resulting in Parental Alienation Syndrome in a child is beyond the knowledge of a

_____

**also** Pa.R.A.P. 126(b) (stating that an unpublished, non-precedential memorandum decision filed after May 1, 2019, may be cited for its persuasive value).

layperson and, therefore, expert testimony is required to understand, as well as to properly diagnose, Parental Alienation Syndrome, which did not occur here." *Id.* at 42 (citation omitted). Instead of appointing an expert, Mother claims that the trial court relied exclusively on the report of the GAL, and impermissibly delegated its judicial, decision-making authority to the GAL. *Id.* at 40, 41.

We reject Mother's argument. First, with respect to her claim that an expert was needed, Mother has waived this issue. When the trial court went through the Section 5328(a) custody factors at the conclusion of trial, making repeated references to Parental Alienation Syndrome, our review of the record shows that Mother lodged no objection that the trial court was improperly making a diagnosis and should have appointed an expert to conduct an evaluation.[23, 24] Accordingly, she has waived this claim. *See* Pa.R.A.P. 302(a)

---

[23] She also does not point us to where she raised such an objection below. *See* Pa.R.A.P. 2119(e) ("Where under the applicable law an issue is not reviewable on appeal unless raised or preserved below, the argument must set forth, in immediate connection therewith or in a footnote thereto, either a specific cross-reference to the page or pages of the statement of the case which set forth the information relating thereto as required by Pa.R.A.P. 2117(c), or substantially the same information.").

[24] We additionally point out that Mother seemingly suggests that she was aware that Parental Alienation Syndrome was involved in the case at the end of the second day of trial, but still did not raise below that an expert was needed. *See* Mother's Brief at 46 ("Mother believes that it was clear to the [t]rial [c]ourt [that Parental Alienation Syndrome was involved in the case] at the conclusion of the second day of trial on August 11, 2022. The opportunity and time to gain that expert opinion over these issues was present between August 11, 2022[,] and December 28, 2022[, *i.e.*, the third day of trial]. At
*(Footnote Continued Next Page)*

("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Notwithstanding, even if not waived, we would be unconvinced that the trial court erred or abused its discretion by failing to appoint an expert to determine if Parental Alienation Syndrome existed in this case. The trial court reasonably explained why it did not appoint an expert, as follows:

> [Section] 5328(a)(1) requires a court to determine "which party is more likely to encourage and permit frequent and continuing contact between the child and another party." Also, [Section] 5328(a)(8) requires a court to evaluate "[t]he attempts of a parent to turn the child against the other parent…." In using the phrase "[P]arental [A]lienation [S]yndrome,["] the court was not attempting to make a medical or psychological diagnosis. The court was describing a pattern of behavior by Mother designed to separate [C]hildren from Father. The court heard credible testimony regarding Mother's attempts to alienate [C]hildren from Father … through interference with Father's communication with [C]hildren. In addition, the court heard testimony regarding Mother['s] calling the Pennsylvania State Police to come and seize an iPad [that] Father gave [C]hildren and testimony regarding other false allegations. Based on the testimony and evidence presented, the [c]ourt found that Mother had prevented [C]hildren from pursuing a normal relationship with Father. The court did not need the testimony of an expert witness to determine that Mother had engaged in behavior designed to turn [C]hildren against Father….

TCO at 9-10.

While the trial court used the phrase 'Parental Alienation Syndrome,' it is evident that it did so to refer to the reoccurring ways in which Mother has

---

that time, Mother had no real hope of an outcome in her favor and her only alternative was to complete the trial and file a notice of appeal. Mother contends that an [i]nterlocutory [a]ppeal after August 11, 2022, was not a realistic option either due to the short period of time between August 2022 and the conclusion of trial.") (citation omitted).

tried to alienate Children from Father.[25]  Expert testimony is not needed to establish that Mother engaged in behavior designed to alienate Children from Father.  ***See Burlington Coat Factory of Pennsylvania, LLC v. Grace Construction Management Company, LLC***, 126 A.3d 1010, 1021 (Pa. Super. 2015) (*en banc*) ("Expert testimony is necessary when a case presents questions beyond the ken of the average layperson.") (citation omitted).  In addition, the record clearly supports the trial court's finding that Mother has tried to alienate Children from Father.  ***See A.V.***, ***supra*** ("The test is whether the evidence of record supports the trial court's conclusions.").  Thus, if preserved, we would disagree with Mother that the trial court erred and abused its discretion by finding that Mother committed parental alienation without expert testimony and evidence to support such a conclusion.

Second, regarding Mother's claim that the trial court impermissibly relied on the GAL, we likewise deem this claim waived due to Mother's failure to raise it in her concise statement and statement of questions involved.  ***See O.G. v. A.B.***, 234 A.3d 766, 781 n.9 (Pa. Super. 2020) (determining that the mother waived an issue where, among other things, she failed to raise it in

---

[25] As Father aptly notes, "if the trial court would have eliminated the word 'syndrome' in its recitation and discussion of the factors, [M]other would have no argument to this [C]ourt[,]" and that its "[d]escribing it as a 'syndrome' was a matter of semantics, not substance."  Father's Brief at 17, 18.

her statement of questions involved and concise statement) (citations omitted).[26]

However, even if not waived, we would discern no such impropriety by the trial court. Though the trial court credited the GAL's report and testimony, and noted the GAL's experience, we would conclude that it did not improperly delegate its judicial authority to her. **Cf. C.W. v. K.A.W.**, 774 A.2d 745, 749-50 (Pa. Super. 2001) (determining that the trial court delegated its judicial power to the GAL where the court repeatedly asked for the GAL's opinion on evidentiary rulings, stated that the GAL taught the court its job, closely followed the GAL's recommendations, and issued its custody order on the same day the GAL delivered its recommendations to the trial court). The fact that the trial court agreed with many of the GAL's observations upon hearing the evidence, and therefore placed weight on the GAL's testimony and report, was in its prerogative as the fact-finder. **See A.V.**, **supra** ("[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial court who has had the opportunity to observe the proceedings and demeanor of the witnesses. The parties cannot dictate the amount of weight the trial court places on evidence."); Father's Brief at 19 ("[S]imply because the court agreed with the [GAL's] recommendation[] does not translate into the

---

[26] Because Mother did not specifically raise this issue in her concise statement, the trial court did not address whether its reliance on the GAL was inappropriate in its Rule 1925(a) opinion.

court['s] 'delegating' its decision-making power to the [GAL]."). As such, no relief is due on Mother's second issue.

## III.

In Mother's third issue, she argues that the trial court abused its discretion and committed an error of law by failing to consider and analyze the factors for relocation set forth in 23 Pa.C.S. § 5337(h). Mother's Brief at 33. Although Father already resided in Mississippi when the trial started, Mother says that the trial court should have considered the Section 5337(h) factors because the modification of custody involved Children's moving to a distant location. *Id.* She also emphasizes that she has been the primary source and provider for Children's needs since their birth, and claims that the trial court gave little to no consideration to the impact on Children of having to attend a new school, make new friends, etc. *Id.* at 35. According to Mother, the trial court's "failure to consider the impact[] of this move to Mississippi on [C]hildren[,] and their continuing developmental and educational needs[,] was an abuse of discretion and error of law." *Id.* at 35-36.

We agree with Mother that the trial court should have considered the factors set forth in Section 5337(h). *See D.K. v. S.P.K.*, 102 A.3d 467, 476 (Pa. Super. 2014) ("In a custody case where neither parent is relocating, but the children stand to move a significant distance, trial courts should still

consider the relevant factors of [S]ection 5337(h) in their [S]ection 5328(a)

best interests analysis."). Section 5337(h) provides:

**(h) Relocation factors.--**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h).

The trial court did not go through the Section 5337(h) factors at the end of the trial, in conjunction with its Section 5328(a) best-interests analysis. The trial court, however, points out that Mother did not object at the time. *See* TCO at 4 ("[A]fter analyzing the custody factors on the record, the [c]ourt specifically asked counsel if there was anything else that needed to be addressed, and neither counsel requested additional analysis. If either counsel wanted the [c]ourt to go through the relocation factors on the record[,] counsel could have stated this."). Our review of the record confirms the trial court's account. Accordingly, Mother has arguably waived this issue. *See* Pa.R.A.P. 302(a), *supra*.

Even if waiver is not appropriate, we would conclude that Mother's third issue lacks merit. Though the trial court did not review the Section 5337(h) relocation factors on the record at the conclusion of trial, it subsequently reviewed them in its Rule 1925(a) opinion. There, it went through the factors as follows:

> *(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.*
>
> This factor was slightly in favor of not granting the relocation because [C]hildren had a closer and longer relationship with Mother than with Father.
>
> *(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational*

*and emotional development, taking into consideration any special needs on the child.*

The [c]ourt determined that this factor was in favor of relocation because Mother had not provided for [C]hildren well in terms of emotional development, as well as other matters. Mother's false accusations against Father regarding various things involving [C]hildren[,] and Mother's attempt to alienate [C]hildren from Father[,] has been detrimental to [C]hildren's emotional development, as well as perhaps other types of development.

*(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.*

The court fashioned an order in which [C]hildren will see Mother quite a lot to accommodate this factor. It is noteworthy that, subsequent to this order, the court had to hold a hearing on reconsideration/clarification to try to help the parties fine-tune Mother's times with [C]hildren and the transportation thereof and whether they need to be in Pennsylvania or Mississippi, which underscores the fact that the court's order obviously provided for a great deal of time for Mother to spend with [C]hildren, and, in fact, Mother has been spending that time with [C]hildren, and therefore the court's order took into account this factor very much.

*(4) The child's preference, taking into consideration the age and maturity of the child.*

As the [c]ourt indicated in analyzing this issue under the custody factors, the [c]ourt only interviewed the older child, H.L.[,] who was seven years old[,] and believed the child had been coached and did not have a well-reasoned preference. The [c]ourt also notes that H.L.'s [GAL] noted in her report that she interviewed H.L. twice and indicated that he exhibited behaviors she had observed in children who had been coached. Therefore, H.L.'s preference was not regarded.

*(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.*

This factor was analyzed thoroughly while assessing the custody factors. Father has always tried to promote a relationship

between [C]hildren and their [M]other. However, Mother has steadfastly, and over a substantial period [of] time, tried to thwart the relationship between [C]hildren and … [F]ather. Therefore, the [c]ourt determined that relocation was necessary.

*(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.*

In this case, the parties were not relocating, but only [C]hildren were relocated from Mother in Pennsylvania[,] to Father in Mississippi. As mentioned, after the parties' divorce in South Carolina, Mother relocated to Pennsylvania and Father subsequently moved to Mississippi. Neither party is seeking to relocate. Therefore, this factor was not applicable.

*(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.*

This factor favored relocation because relocation will enable [C]hildren to thrive under Father's primary … parenting role.

*(8) The reasons and motivation of each party for seeking or opposing the relocation.*

Father's motivations for moving [C]hildren to Mississippi were noble. Father wanted to enable [C]hildren to have a more normal relationship with both parents. On the other hand, Mother's opposition to the relocation was not motivated by noble reasons. It seemed to the [c]ourt that Mother simply wanted dictatorial control over [C]hildren's lives. Thus, this factor favored relocation.

*(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.*

This factor favored relocation because Mother's dictatorial control over [C]hildren[,] and attempts to alienate [C]hildren from their [F]ather[,] rises to the level of emotional abuse. Therefore, this was a factor highly in favor of relocation.

For example, the [c]ourt heard testimony that Father was having difficulty for years in communicating with … [C]hildren in having to call Mother's phone, being hung up on, or being concerned about being accused of stalking. Father testified that he discussed

with Mother his purchase of an iPad for [C]hildren to use in communicating with him. In this way, Father would not have to call Mother's phone to exercise his court-ordered times of communication with [C]hildren. After [C]hildren brought the iPad to her home, Mother called the Pennsylvania State Police and had the iPad seized. The police officer who visited the home and seized the iPad indicated that Mother was concerned that Father was seeking to get … information about her. Apparently, H.L. either witnessed the officer or his car[,] or learned about the seizure in some way, causing or contributing to anxiety attacks. In her report, the [GAL] noted that, "I discussed with [H.L.] what he called his 'worry attacks' but he could not articulate when they started o[r] why he was having them. He mentioned that the 'cops came and took … Father's iPad' from his Mother's house and now he worries they will come and arrest his Mother." There seems to be a link between H.L.'s anxiety and Mother's action in having the police come to the home to seize the iPad. At any rate, the court sees this behavior as supportive of Father's assertion regarding Mother['s] attempting to alienate him from [C]hildren. This factor weighed in favor of relocation. The [c]ourt also notes that [C]hildren's [GAL] testified that, "I believe that it is in [C]hildren's best interest to immediately go and live primarily with [F]ather."

*(10) Any other factor affecting the best interest of the child.*

This factor was not applicable.

TCO at 5-8 (internal citations omitted; some brackets added).

Contrary to Mother's argument, the trial court acknowledged that Children have a closer and longer relationship with Mother. However, it also found — and placed great weight on the fact — that Mother's behavior has been detrimental to Children in terms of their emotional development. It noted Mother's history of false accusations against Father and her efforts to thwart Children's relationship with him, characterizing her attempts at alienation as emotional abuse and citing H.L.'s worry over the iPad incident. Despite Mother's behavior, the trial court's final custody order permits Mother

to see Children relatively often, considering the distance between the parties. In addition, it promotes Children's having a more normal relationship with both of their parents.

In reviewing the trial court's Section 5337(h) analysis, we would conclude that the record supports the trial court's findings and conclusions. **See A.V.**, **supra**. We also remind Mother that "[t]he parties cannot dictate the amount of weight the trial court places on evidence." **Id.** Accordingly, even if preserved, Mother's third issue would fail.

**IV.**

In Mother's fourth and final issue, she argues that the trial court abused its discretion and committed an error of law by transferring primary physical custody to Father before all testimony and evidence was presented. Mother's Brief at 13. As mentioned *supra*, at the conclusion of the second day of trial on August 11, 2022, the court entered a temporary custody order, in which it granted Father sole legal custody and primary physical custody of Children. While Mother acknowledges that Pennsylvania Rule of Civil Procedure 1915.13 authorizes the trial court to enter temporary orders in cases where a party has requested special relief, she points out that Father never made such a request. **Id.** at 17. In addition, Mother insists that the trial court had to analyze and consider, at a minimum, the factors set forth in Section 5328(a) before transferring custody in the middle of trial, which she says it did not do. **Id.** at 18. As a result of the trial court's allegedly inappropriate temporary

order, Mother asks us to vacate the trial court's final custody order and remand for further proceedings. *Id.* at 32.

Again, no relief is due. Initially, in Mother's concise statement and statement of the questions involved, she only contends that the trial court erred and abused its discretion by transferring custody to Father, prior to the conclusion of trial, before all testimony and evidence was presented.[27] In her concise statement and statement of questions involved, she did not specifically challenge the trial court's temporary custody order on the basis that Father had not requested such special relief and/or that the trial court had not analyzed the Section 5328(a) factors before transferring custody.[28] Thus, those aspects of Mother's argument are waived. *See* Pa.R.A.P. 2116(a), *supra*; *O.G.*, *supra*.[29]

Turning to Mother's preserved claim that the trial court should not have entered a temporary custody order prior to the conclusion of evidence, assuming *arguendo* that this issue is not moot, we point out that Rule 1915.13

---

[27] At trial, Mother also only objected to the trial court's temporary custody order on the basis that it was entered prior to the conclusion of the evidence. N.T., 8/11/22, at 116 ("Your Honor, for the record, I'm going to place an objection to the entry of this order prior to the conclusion of the evidence and the record in this case.").

[28] The trial court also did not address these specific issues in its Rule 1925(a) opinion.

[29] Further, even if not waived, we would decline to disturb the trial court's final custody order — which we have determined the trial court properly entered — due to any such purported errors made in the trial court's prior, temporary custody order.

states that "***[a]t any time after commencement of the action***, the court may on application or ***its own motion*** grant appropriate interim relief.  The relief may include, but is not limited to, ***the award of temporary legal or physical custody***…."  Pa.R.Civ.P. 1915.13 (emphasis added).  Here, the trial court temporarily awarded Father primary physical custody and sole legal custody of Children pending the final day of trial, and Mother does not persuade us that the trial court was not authorized to do so under Rule 1915.13 because trial had not yet concluded.[30]  Thus, Mother's final issue also fails.

Order affirmed.

McLaughlin, J., concurs in the result.

Sullivan, J., concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/15/2023

---

[30] As Father observes, by the end of the second day of trial, the trial court had heard substantial evidence of Mother's emotional abuse of Children.  Father's Brief at 5-7; ***see also*** N.T., 8/11/22, at 117 (the trial court's observing at the end of the second day of trial that it will likely make a finding that Mother has alienated Children from Father, and noting that Mother's behavior may amount to emotional abuse).  In addition, Father points out that, at that time, the beginning of the school year was approaching.  Father's Brief at 6.